269 So.2d 850 (1972)
Felix DESHOTEL, Plaintiff-Appellant,
v.
AETNA CASUALTY & SURETY COMPANY, Defendant-Appellee.
No. 3981.
Court of Appeal of Louisiana, Third Circuit.
November 10, 1972.
Rehearing Denied December 20, 1972.
Writ Refused February 1, 1973.
*851 Jacque B. Pucheu, Eunice, for plaintiff-appellant.
Voorhier, Labbe, Fontenot, Leonard & McGlasson by J. Winston Fontenot, Lafayette, for defendant-appellee.
Davidson, Meaux, Onebane & Donohoe by Robert L. Cabes, Lafayette, for intervenor-appellee.
Before SAVOY, HOOD and MILLER, JJ.
MILLER, Judge.
Plaintiff Felix Deshotel appeals the trial jury's dismissal of his medical malpractice suit against defendant Aetna Casualty & Surety Company, the insurer of Dr. Leonel Kahn. Dr. Kahn died shortly after suit was filed. We reverse and award damages.
In a work connected accident which occurred about 2 p. m. on April 14, 1970, Deshotel fractured his right wrist. The injury was diagnosed as a comminuted (shattered) impacted fracture of the right distal radiussometimes referred to as a serious Colles fracture. Deshotel's employer Associated Distributing Company in Rayne, Louisiana sent plaintiff to the company physician Dr. Kahn and workmen's compensation benefits were commenced.
Dr. Kahn x-rayed the wrist, reduced the fracture (set the bones in their anatomical position), casted the injured area in a long-arm circular cast and again x-rayed the wrist. Deshotel returned to light duty the following day and there is a conflict in the testimony concerning whether Dr. Kahn instructed Deshotel to return to light duty or to stay home and rest.
On April 17 Deshotel returned to Dr. Kahn's office as he was instructed to do. The arm was severely swollen. To relieve pressure Dr. Kahn bi-valved the cast (split the cast into two pieces) and applied an ace bandage around the cast to keep pressure on the fractured area to prevent slippage. Dr. Kahn's records show that Deshotel returned for treatment on April 22, 29 and May 5, 1970. The bi-valved cast was *852 retaped to tighten it and on the May 5 visit an x-ray was taken which showed misalignment of the wrist. Dr. Edward LeBlanc, surgeon, was consulted by Dr. Kahn and at his request, Deshotel was hospitalized on May 10th. On May 11, Dr. LeBlanc attempted to re-manipulate the fracture while Deshotel was under a general anesthetic, but found that it was too late to correct the mis-alignment. The healing process was too far advanced. A new cast was applied.
Deshotel was discharged from the hospital on May 13. He was seen by Dr. Kahn on May 20, 27, June 6 and on June 10 the cast was removed. Dr. LeBlanc had suggested that physical therapy should follow removal of the cast. Sixteen diathermy treatments were administered at Dr. Kahn's office from June 11 to July 7th.
On July 10, 1970 Deshotel changed physicians and was thereafter treated by Dr. John L. Guidry, a general practitioner of Rayne. He treated the 51 year old right handed plaintiff from July 10, 1970 until January 1971. Intensive physical therapy and exercises were prescribed and undertaken by Deshotel. Dr. Guidry recommended Deshotel for work as an assistant cook. This was tried for several days, but Deshotel was unable to handle the work because he could not lift anything with his right hand. Dr. Guidry estimates that plaintiff has a total and permanent disability of 50% and concluded that Deshotel is totally and permanently disabled from returning to hard manual labor.
On April 8, 1971 Deshotel went back to work for his original employer, but could not perform the hard manual labor required prior to the injury. He currently works as a janitor and does odd jobs which don't require use of his right hand.
Dr. Guidry testified that he and the other four Doctors (excluding Dr. Kahn) in the Rayne community treated these injuries by hospitalizing the patient and elevating the injured arm to prevent or reduce swelling. These five physicians required additional x-rays taken during the first 10 days to establish that there was no slippage of the original reduction. If there was slippage, a second reduction would be promptly administered.
It was uniformly agreed that if a second reduction was needed, it should be performed within two weeks of the injury. Thereafter the healing process would prevent a suitable re-alignment.
Dr. Edward LeBlanc, surgeon of Lafayette, Louisiana testified that he was frequently consulted by physicians in Rayne; that an x-ray should have been taken three days post injury; that frequent x-rays should be made to discover slippage and mis-alignment; that slippage or mis-alignment must be corrected within ten days so that re-manipulation could correct the condition; and that it was too late to improve the alignment when he attempted it on May 11, 1970.
Dr. Wallace McBride, radiologist of Lafayette, testified that he was frequently consulted by physicians in Rayne; that he examined the x-rays made by Dr. Kahn on April 14; that the ". . . post-reduction films of Mr. Deshotel's arm does not reveal complete anatomical reduction. . . that Dr. Kahn was aware that he could improve this reduction possibly by placing more traction and resetting the arm . . ." Tr. 221; that it was better practice to treat a Colles fracture in the hospital and to keep the arm elevated; and that it is unacceptable practice to wait twenty-one days after the injury to x-ray to check the alignment.
Defendant argues that the May 5th x-ray was timely because the swelling in Deshotel's arm prevented a re-manipulation. The medical testimony supported the contention that swelling could prevent a re-manipulation.
This line of testimony is overcome by the testimony of Dr. McBride that Dr. Kahn was informed that the post-reduction x-ray indicated that the reduction should *853 be improved. The record also establishes that Deshotel's arm was swollen on May 11, 1970 when Dr. LeBlanc hospitalized Deshotel and attempted to re-manipulate the fractured site while Deshotel was under a general anesthetic. Dr. LeBlanc could not improve the condition because he was called too latethe bones had "jelled" the healing process was too far along.
Although the findings of fact by a trial judge or jury are entitled to great weight on appeal and will not be disturbed unless found to be clearly erroneous, the appellate court must review the facts as well as the applicable law in a civil case and the verdict will be set aside if the judgment is clearly erroneous. LSA-Constitution Article 7, § 10; Lewis v. Travelers Insurance Company, 247 So.2d 635 (La.App. 3 Cir. 1971); Barry v. Billac, 250 So.2d 516 (La.App. 4 Cir. 1971).
The failure of a physician or surgeon to obtain a cure or to obtain satisfactory results does not give rise to a presumption of fault against the practitioner. Phelps v. Donaldson, 243 La. 1118, 150 So. 2d 35 (1963). The law only exacts of physicians and surgeons that degree of skill and care usually possessed and exercised by practitioners of their profession in the same community and makes it their duty to use reasonable care and diligence along with their best judgment in the application of their skill. Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953).
Our jurisprudence does not require a physician to exercise the highest degree of care or skill possible in treating a patient. Nor does it impute negligence to the physician who fails to follow that course of treatment which, at a later date, may be proved to be the wiser course. The physician is only responsible for exercising his best judgment and administering reasonable care. Whether he has complied with that degree of care required in treating a patient is measured by the skill ordinarily employed by the members of his profession in good standing in his community in treating the same complaint or injury. Lindsey v. Michigan Mutual Liability Co., 156 So.2d 313 at 316 (La.App. 4 Cir. 1963).
Plaintiff carried the burden of showing that the standard of care in the Rayne community required that the patient be treated for the expected swelling; that the reduction obtained at the original treatment should be shown as acceptable; and that follow-up x-rays should be taken within the first 10 days so that re-manipulation could be attempted before the healing process was too far advanced. Dr. Kahn was negligent in failing to meet each of these standards of care.
We next consider whether or not plaintiff proved that a properly treated fracture of this type would not have produced a significant disability of his right extremity.
Dr. LeBlanc testified that this complication with the shortening of the bone and the turning of the hand in toward the body could occur even if the very best medical attention were given to a patient. Tr. 77. Specifically he testified that Deshotel's present condition "could be a result of the treatment or it could be a result of the fracture."
Dr. Guidry admitted that Deshotel could have a disability even with good medical treatment (Tr. 185) and that there are times when a doctor has to accept a reduction that is not complete. Tr. 187.
Although plaintiff Deshotel failed to introduce specific testimony stating that proper medical care would have improved his condition, the medical testimony leads unalterably to the conclusion that plaintiff's present disability would be substantially reduced had the Colles fracture been properly reduced and followed. Nevertheless the quantum must be reduced because it was not established that the entirety of plaintiff's 50% disability is related to his *854 treatment. Good treatment sometimes leaves a 20-35% disability.

QUANTUM
This illiterate, uneducated 51 year old plaintiff was supporting two children at the time of the injury. He had a life expectancy of 22 years. He lost eleven months wages at $300 per month. His future loss of earnings is questionable because he cannot compete in the market for common labor which is the only type employment available to him.
Plaintiff has suffered and will continue to suffer great mental and physical pain. He cannot lift his right arm upward, cannot close his right hand because of a loss of grip, cannot twist his wrist, cannot handle money change in his right hand, can no longer cook meals, cannot hunt or fish.
Plaintiff claims that he is entitled to the $50,000 limits of defendant's policy.
Each case must be evaluated according to its own peculiar facts and circumstances as to the damage caused by that type injury. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indemnity Company, 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967).
Considering the fact that a complete recovery was not likely, an adequate award for that portion of plaintiff's pain, suffering and disability related to his negligent treatment, is set at $25,000.00.
We recognize the claim of intervenor Fireman's Fund Insurance Company (the workmen's compensation insurer for Deshotel's employer) in the amount of $4,976.12 together with such additional sums as it may pay to or in behalf of plaintiff under the Louisiana Workmen's Compensation laws.
The judgment of the trial court is reversed and set aside. It is ordered, adjudged and decreed that plaintiff Felix Deshotel have judgment against defendant Aetna Casualty & Surety Company in the principal sum of $25,000.00, plus legal interest thereon from judicial demand until paid, plus all costs of court in both the trial and appellate courts. It is further ordered, adjudged and decreed that there be judgment in favor of intervenor, Fireman's Fund Insurance Company, and against plaintiff, Felix Deshotel, recognizing its claim in the amount of $4,976.12, and for such additional sums as it may pay to or in behalf of plaintiff under the Louisiana Workmen's Compensation laws.
Reversed and rendered.
HOOD, J., dissents, being of the opinion that the judgment of the trial court is correct.